# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-01905-SCT

*JOSEPH DREHER STACK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2001 |
| TRIAL JUDGE: | HON. STEPHEN B. SIMPSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JACK LUCIAN DENTON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/16/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Joseph Dreher Stack was convicted in the Circuit Court of the Second Judicial District of Harrison County on a two-count indictment for the murders of James Thomas and Larry Albert Chopones. Stack was then forthwith sentenced by Judge Stephen B. Simpson to serve consecutive terms of life imprisonment. Stacks appeals to us from the entry of the circuit court's final judgment consistent with the jury verdicts and sentences. Finding no reversible error, we affirm both the convictions and the sentences imposed.

# FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     On the evening of October 24, 1998, Stack and his companion, Gene Livingston, left the Veterans Administration Hospital (VA) and went out for drinks at a local pub.  Prior to returning to the VA, they purchased a bottle of Mad-Dog 20/20 which they promptly drank in a vacant lot with Larry Chopones.  At some point, Chopones reached out.  Stack allegedly believed that Chopones was going to strike Livingston so Stack hit Chopones.  Chopones then pulled a knife from his pocket.  Stack took the knife away from Chopones, stabbed him, and slit his throat.  Chopones was stabbed approximately thirty times and slashed approximately nineteen times.

¶3.     While Stack was sitting on top of Chopones, James Thomas and Daisy Jones entered the vacant lot.  They yelled at Stack to stop, but Stack continued stabbing Chopones.  Thomas grabbed a stick or small tree limb and struck Stack, who then stopped stabbing Chopones and turned on Thomas, stabbing him twice.  Stack grabbed Livingston, and they left, heading toward the VA.  Thomas walked approximately fifty feet, and then fell.  He died that evening.  Chopones died the following morning.

¶4.     Stack was stopped by a police officer on Veterans Avenue.  Stack was covered in blood and had the knife in his front pocket.  Both Stack and Livingston were arrested for public drunkenness.  Approximately three hours later, Stack gave a recorded statement in which he admitted killing both Chopones and Thomas.

¶5.     On May 13, 1999, while incarcerated awaiting grand jury action, Stack filed a pro se motion for speedy trial. On July 1, 1999, Stack was indicted on two counts of murder.  Although another attorney represented Stack at the initial appearance, attorney Michael Cox was appointed on July 13, 1999, to represent Stacks. On November 5, 1999, Cox filed numerous motions, including a motion for discovery,

2

motion to suppress the confession, motion for a speedy trial, and a motion for an omnibus hearing. On January 18, 2000, the court entered an order for mental evaluation. Thereafter several motions for continuance were filed by defense counsel. The first such motion was filed on April 10, 2000, citing the need to obtain VA records. The trial court granted the motion on the same day and reset the case for trial for July 17, 2000. A separate order was likewise entered on May 9, 2000, reaffirming both the continuance and the trial date of July 17, 2000. The second motion for continuance was filed and granted on August 7, 2000; however, no reason was given. On February 5, 2001, a third motion for continuance was filed citing the need for psychiatric evaluation. On the same day, the trial court granted the motion and reset the case for trial to commence on May 7, 2001. Cox filed each of these motions on behalf of Stack. The fourth and final written motion for continuance was filed on April 9, 2001. In this motion, attorney Don Smith requested a continuance because Cox was no longer with the Contract Criminal Defender's Program (CCD). The motion was granted, and the trial was again reset for June 11, 2001.

¶6. In late April or early May, 2001, John Dawson was hired to replace Cox at the CCD. Dawson made an ore tenus motion for a continuance on June 12, 2001; however, this motion was denied. The trial began on June 14, 2001, at the conclusion of which Stack was convicted on both counts of murder and sentenced to serve consecutive life imprisonment sentences. Stack now appeals to us.

### DISCUSSION
**I.     WHETHER THE TRIAL JUDGE ABUSED HIS DISCRETION BY DENYING THE DEFENDANT'S MOTION FOR CONTINUANCE.**

¶7. Stack contends that the denial of his ore tenus motion for continuance constituted reversible error. In *Gray v. State*, this Court stated:

This Court has held that the trial court's denial of a continuance should not be reversed unless it appears to have resulted in manifest injustice. *Hatcher v. Fleeman*, 617 So.2d 634, 639 (Miss. 1993).

. . .

Miss. Code Ann., § 99-15-29 (2000) states as follows:

> On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom.

The decision to grant or deny a continuance is left to the sound discretion of the trial court. *Johnson v. State*, 631 So.2d 185, 187 (Miss. 1994); *Wallace v. State*, 607 So.2d 1184, 1191 (Miss. 1992); *Morris v. State*, 595 So.2d 840, 840 (Miss. 1991); *Fisher v. State*, 532 So.2d 992, 998 (Miss. 1988).

*Gray v. State*, 799 So.2d 53, 58 (¶ 14, 16-17) (Miss. 2001). The burden of showing manifest injustice is not satisfied by conclusory arguments alone, rather the defendant is required to "show concrete facts that demonstrate the particular prejudice to the defense." *Burns v. State*, 729 So. 2d 203, 213 (Miss. 1998); *Atterberry v. State*, 667 So.2d 622, 631 (Miss. 1995); *Jackson v. State*, 538 So. 2d 1186 (Miss. 1989) (defendant was given "full opportunity" to show prejudice in a hearing on a motion for new trial, but failed).

¶8. The denied motion for continuance about which Stack now complains was an ore tenus motion. In other words, neither Stack nor his counsel made any effort to comply with the procedural requirements of Miss. Code Ann. § 99-15-29 in securing a continuance from Judge Simpson. This Court has repeatedly held that a judge did not abuse his or her discretion and would not be put in error in denying a defendant's motion for continuance of a criminal case when that defendant failed to comply with the procedural guidelines set out in this statute in attempting to secure a continuance from the trial judge. *Edwards v. State*, 594 So.2d 587, 591 (Miss. 1992); *Gates v. State*, 484 So.2d 1002, 1005-06 (Miss. 1986); *Smith v. State*, 278 So.2d 454, 455 (Miss. 1973).

¶9. Stack also contends that his counsel had only been assigned to the case six weeks before the trial setting. However, this Court has previously held:

> Denials of motions for continuance have been upheld where defense counsel was afforded fewer days to prepare for trial than here: *Hughey v. State,* 512 So.2d 4, 6 (Miss. 1987) (defendant caused to go to trial on day of arraignment and nine days after appointment of counsel); *Cole v. State,* 405 So.2d 910, 911-12 (Miss. 1981) (counsel had seven days to prepare for murder trial); *Speagle v. State,* 390 So.2d 990, 992 (Miss. 1980) (new counsel forced to prepare for incest trial in one day); *Shaw v. State,* 378 So.2d 631, 633-34 (Miss. 1979) (defense counsel afforded eight days to prepare); *Garner v. State,* 202 Miss. 21, 24, 30 So.2d 413, 414 (1947) (seven-day preparation time for capital murder trial).

*Morris v. State*, 595 So.2d 840, 843 (Miss. 1991) (counsel had 13 days to prepare for sex crimes trial). *See also Fisher v. State*, 532 So.2d 992 (Miss. 1988) (no abuse of discretion with 24 days to prepare). *Boyington v. State*, 389 So.2d 485 (Miss. 1980) (over the weekend); *Brown v. State*, 252 So.2d 885 (Miss. 1971) (4 days).

¶10. In today's case, there has been no showing that Stack's counsel would have done anything differently or presented any different type of defense had the motion been granted. The record is silent as

to any notice of insanity plea by the defendant.[1] This Court is placed in a position, just as the trial court was, where we can only speculate whether the failure to have the mental evaluation performed was negligence, an intentional tactical maneuver, or an intentional effort to attempt to further delay the trial of this case.

¶11.    After Stack's counsel made the ore tenus  motion for a continuance on June 12, 2001, two days before trial, Judge Simpson conducted a motion hearing on that day, and the record was further supplemented on June 13, 2001, with testimony and additional argument of counsel.  At this hearing, defense counsel John C. Dawson, Jr., asserted that he had "picked up this file as one of approximately 125 that Mr. Cox, Michael Cox, was appointed on.  That was at the very end of April, first of May."  Dawson asserted that he had insufficient time to prepare for trial and that he believed that additional psychological testing of his client was necessary to the presentation of a defense.

¶12.    After noting that Smith was appointed co-counsel in April 2001, the trial judge questioned Dawson:

> Mr. Dawson, given that there are several continuance orders in the file based on the defendant's request to obtain records, medical records is how they're characterized, and that there is a January of 2000, January 18th of 2000, order signed by Judge Whitfield, ordering a mental evaluation for Mr. Stack, and that nothing has been done in that regard, what is–I mean, what explanation or what further benefit would delay be in this matter?

Counsel maintained that he had "picked up this file six weeks ago" and that he had no "explanation for the delay other than" the fact that prior counsel for the defendant had attempted to obtain the records.  After reciting the procedural history of the case, including Stack's pro se motions for speedy trial, the trial court ruled:

> There being no further evidence of any substantial basis that the defendant suffers any mental deficiency that would inhibit his ability to assist counsel in his defense, understand

---

[1]URCCC 9.07 requires that a defendant timely serve the prosecuting attorney with pretrial notice of any intention to assert an insanity defense.

the nature and purpose of the proceedings, or the parties participating in the trial, that is the jury, the defense counsel, the judge and the prosecutor, or any evidence of any other ongoing psychosis, I don't feel the need to delay this matter any further for the purposes of a mental evaluation, there being nothing before the Court, and certainly there being evidence contrary, the defendant's numerous pro se petitions to the Court indicating he certainly has a well-founded understanding of the proceedings in his case.

What I'm going to do is deny the continuance at this time and allow the motion–or rather allow the case to remain on the docket. And at the conclusion of today, we'll make a determination as to where it falls in the trial docket, in the trial calendar for this week.

After further argument by counsel, the trial court further concluded:

Well I think we're getting ahead of ourselves. We're all speculating on what records that the defense could have obtained more than three years ago might show. All I know is that there's been an inordinate amount of time to obtain those records and for whatever reasons, they've not been obtained. And the case, based on an absence in the record or from counsel of any showing that the defendant cannot assist counsel, we're going to move forward on it.

¶13.    This case was purposely scheduled on the docket for later during the same week, on Thursday. It was suggested that a local psychologist or psychiatrist evaluate Stack and enter a verbal opinion. The trial judge stated that if the evaluation were performed and Stack was found incompetent to stand trial or that the professional determined that the missing medical records were necessary for a complete evaluation, then he could reconsider the motion for continuance. Stack refused a local examination and stood on the record before the court which included the previously ignored order for a mental evaluation. Again, the judge found no justification nor any evidence showing the previous reason (or any reason) for the request for that order.

¶14.    During the post-trial hearing on the motion for a new trial, Stack's counsel argued that denial of the last motion for continuance deprived him of the effective assistance of counsel. The exchange follows:

THE COURT: Why was no testimony from Mr. Cox offered at that point? How am I to know that was ineffective assistance, laziness, lack of due diligence, or just strategy, Mr. Dawson? Maybe he had the opportunity to see these records and decide, I don't want

7

a psychiatrist's opinion on this. The point is we're both speculating on what those may or may not have shown.

MR DAWSON: Yes sir. And that all goes toward why we had requested a continuance for being–that we were not at that time prepared because we had both just been appointed to the case and needed additional time. And also–

THE COURT: No Sir. No, sir, Mr. Dawson. Mr. Smith had been on the case for months and months. And as I recall, I recited in the record at that time about seven defense continuances in this matter, which was an October 24, 1998 homicide.

MR DAWSON: Yes, sir.

THE COURT: So he was not brand new to the case. He had been on it for months. And you had had the discovery since you took over the case.

¶15. The assistant district attorney likewise set out the State's position on the issue as follows:

We would state that there was a good deal of discussion and argument concerning the VA records that had not yet been obtained from the Jackson Veterans Administration Office in relation to the defendant and his prior psychological well being and problems.

Of course the State's opinion would be that the reason why after three years they were not obtained is because they would not have been helpful to the defense. However, that would be speculation, and the court can't consider speculation. However the entire argument set forth today by the defense is also a matter of speculation. They had an opportunity to acquire those records. They did not.

As the Court pointed out, Mr. Cox did not testify at that hearing, nor do we have Mr. Cox here today or an affidavit from Mr. Cox as to the reason why he did not pursue those. Perhaps those were strategy, that was a strategy decision after discussing with his counsel. But the record is silent as to any of that.

As the Court cannot speculate to assist the State, I don't believe the Court can speculate to assist the defense. And we would set forth that particularly in the light of the facts also. Your Honor, that the Court gave the defense an opportunity and a several-day recess to obtain a local psychological evaluation.

And if that–it's my understanding that the Court allowed or ordered that in the event that psychological evaluation determined that there may be of some assistance to the Court in the long run by obtaining these records, that the State would be agreeable to a continuance, and the Court would sustain that, potentially sustain the motion for

8

continuance at that time. However, once again the defense did not desire that particular option.

We feel that the entire matter of the psychological records of the defendant were for delay, and that is supported by their decision of not going forward with the local psychological evaluation.

¶16. As already noted, the case was scheduled on the docket for later during the week (Thursday, June 14, 2001) to provide Stack with the opportunity to be evaluated by a local psychiatrist or psychologist. Actions speak louder than words. On more than one occasion the trial judge suggested to defense counsel that Stack could submit to an evaluation by a local psychologist or psychiatrist and that he would reconsider the motion if the determination was made that the allegedly missing medical records were necessary; however, on each occasion, defense counsel obstinately refused this offer and simply stated that they "were standing on the record." The very perceptive trial judge recognized this defense tactic for what it was. The learned trial judge acted well within the realm of the exercise of sound judicial discretion in refusing the defendant's request for a continuance.

¶17. As noted, the record reveals that Judge Simpson was dealing with a fifth motion for continuance and that Stack himself had filed pro se letters requesting a speedy trial (the trial judge referred to two or three letters although only one letter appears in the clerk's papers). No affidavit was filed in support of the motion. No reason for the failure to secure the court- ordered psychological examination was given. Although Dawson may have been appointed six weeks before trial, Smith was not. On April 9, 2001, Smith filed the fourth motion for continuance and was, at a minimum, appointed as co-counsel (the prosecutor recalled that Smith was actually appointed as lead counsel). In fact, Dawson was also in the courtroom on another matter at the hearing on the fifth motion, and Dawson recalled the discussion of this

9

matter. Dawson's understanding was that whoever took Cox's place would be responsible for the double murder trial and that Smith would assist. Less than a month later, Dawson replaced Cox.

¶18. Smith was aware of the order for the mental examination at the State Hospital at Whitfield. Smith was also aware that the then currently assigned trial date was a "hard" trial setting. Dawson claims he was not able to read through the file and that he inherited this case along with 125 other files requiring immediate attention. Dawson provided a list of those assigned cases. Of those cases, only two defendants had been charged with murder – this double murder which had already been set for trial and another murder case which had not been set for trial. Dawson testified that he had never tried a murder case; however, Dawson's co-counsel, Smith, had extensive trial experience. Smith was the senior attorney of the CCD and when asked how many murder cases he had tried, he responded "more than I care to remember but – to give you a number in all, I don't know, 15, 20, or more." Smith was a prominent figure throughout the pre-trial, the trial, and post-trial proceedings.

¶19. This Court agrees with the trial judge's finding that the defense's failure to have the mental evaluation performed acted "as a further mechanism for delay in this case over a period of more than three years, to the detriment of the system in general, certainly to the victims of this family [sic], to the State's ability to prosecute it, to the witnesses' ability to fairly and accurately remember the circumstances, all to the detriment of both the defendant and the State in this case." Therefore, for all these reasons, we find that the trial judge did not abuse his discretion in denying Stack's fifth request to have his trial continued. Additionally, as a matter of fact and well-settled law, Judge Simpson was eminently correct in denying Stack's ore tenus motion for continuance.

II. **WHETHER STACK RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL.**

10

¶20.    Stack next contends that his convictions and sentences should be overturned because he was not afforded effective assistance of counsel during the trial. Under three separate assignments of error Stack contends that his counsel failed to prepare for trial, failed to have Stack evaluated by the local psychologist or psychiatrist, and failed to argue self-defense.

The standard for determining if a defendant received effective assistance of counsel is well settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S.Ct. at 2064. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State,* 454 So.2d 468, 477 (Miss. 1984), citing *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Stringer,* 454 So.2d at 477, citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Defense counsel is presumed competent. *See Finley v. State,* 725 So.2d 226, 238 (Miss. 1998), quoting *Foster v. State,* 687 So.2d 1124, 1130 (Miss. 1996). *See also Johnson v. State,* 476 So.2d 1195, 1204 (Miss. 1985).

Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State,* 584 So.2d 426, 430 (Miss.1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.* The question here is

11

> whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.
>
> There is no constitutional right then to errorless counsel. *Cabello v. State*, 524 So.2d 313, 315 (Miss. 1988); *Mohr v. State*, 584 So.2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel). If the post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Neal v. State*, 525 So.2d 1279, 1281 (Miss. 1987); *Mohr v. State*, 584 So.2d 426 (Miss. 1991).

*Davis v. State*, 743 So.2d 326, 334 (Miss. 1999), citing *Foster v. State*, 687 So.2d 1124, 1130 (Miss. 1996).

*Woodward v. State,* 843 So.2d 1, 7 (¶ 14) (Miss. 2003).

¶21. Stack contends that there was a reasonable probability that the outcome of the trial would have been different if defense counsel were prepared to try the case, if defense counsel had Stack evaluated by a local psychiatrist, and if counsel had made an argument for self-defense. However, Stack fails to make a showing as to why this is so. Stack relies on *Reed v. State*, 536 So.2d 1336, 1339 (Miss. 1988) (citing *Cabello v. State*, 524 So.2d 313, 315 (Miss. 1985)), for the proposition that there was a reasonable probability that the outcome would have been different. However, neither of those cases found counsel to be ineffective. In denying the assignment of error, we held that "since there is 'no single, particular way to defend a client or to provide effective assistance,' and courts are 'reluctant to infer from silence an absence of strategy,' this Court finds defense counsel's performance neither deficient nor prejudicial." *Id.* at 317 (citing *Leatherwood v. State*, 473 So.2d 964, 969 (Miss. 1985)).

12

¶22. In the instant appeal, Stack has failed to show <u>any</u> probability that the outcome would have been different. Rather, Stack relies on conclusory statements. Stack failed to provide this Court with any evidence that counsels' actions were anything other than trial strategy. Accordingly, this issue is without merit.

### III. WHETHER THE TRIAL COURT ERRED BY DENYING A "HEAT OF PASSION" JURY INSTRUCTION.

¶23. Stack contends he was entitled to a heat of passion jury instruction as to Count II (the victim was Larry Albert Chopones). Stack further contends he lacked the requisite intent to kill Chopones and that a manslaughter instruction should have been given. Stack made a *Weathersby* argument as to the issue of malice. *See Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933).

¶24. Mississippi's law is well settled as to appellate review of a trial court's grant or denial of jury instructions:

> The standard of review for challenges to jury instructions is as follows:
>
>> [T]he instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case. *Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000)(citing *Heidel v. State*, 587 So.2d 835, 842 (Miss. 1991) (citations omitted)).
>
> *Woodham v. State*, 779 So.2d 158, 163 (Miss. 2001).
>
> Thomas first complains of the trial court's refusal of D-14, which reads as follows:
>
>> You are instructed that because the defendant was the only eye-witness to the alleged shooting, his version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by credible witnesses for the State or by facts of common knowledge.

13

Thomas correctly states that this is derived from our decision in *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933). He further directs our attention to *Blanks v. State*, 547 So.2d 29, 33 (Miss. 1989), where we reaffirmed the *Weathersby* rule and said "the *Weathersby* rule is simply a statement of a well-recognized principle of law that where the defendant's, and sole eyewitness's, version of a slaying is uncontradicted, reasonable and credible, it must be believed. And, if such version creates an absolute legal defense, he is entitled to a directed verdict of acquittal."

However, the State correctly argues that "[t]he *Weathersby* rule ... is not a jury instruction but a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict." *Blanks v. State*, 547 So.2d at 34; *Griffin v. State*, 495 So.2d 1352, 1355 (Miss. 1986); *Harveston v. State*, 493 So.2d 365 (Miss. 1986). Consequently, this assignment of error is without merit.

*Thomas v. State*, 818 So.2d 335, 349-50 (¶¶ 47-50) (Miss. 2002).

¶25.    In essence, Stack argues that he initially perceived an attack of his friend, Gene Livingston, and that his initial actions were taken in self-defense of his friend. However, Stack goes on to argue that prior to the cessation of the stabbing, the existing facts and circumstances created a *Weathersby* scenario. In support of this contention, Stack asserts that the only other person who was present at this time besides Stack and Chopones was Livingston, who did not testify at the trial. The State did, however, present a recorded statement taken from Stack several hours after the murder, in which Stack said:

A.    He (Chopones) reached for Gene (Livingston) and I took his arm away.
Q.    Then how, then how did...
A.    And I stabbed him with his own knife.
        ....
Q.    He pulled it out and then what happened?
A.    He pulled it out of his own God D--- pocket and I took it away from him and I hurt him.
Q.    What did he say when he pulled it out?
A.    He didn't say much because he was drunk but when people f--- with my friends, I go ballistic and when that, uh, the black people came from the uh, the store sh-- and said oh my God, they're hurting him. They're like three f—ing black dudes on me. What the f--- am I supposed to do? Yea, I stuck that m----- f-----, man when he (Thomas) tried to hit me, after he hit me hit me in the head once, once with that stick took my arm and wrapped it around and pulled up and stuck him, f--- yea I did.

14

> ...
> Q.	Did you stick him or did you cut him, the white guy (Chopones)?
> A.	No, I, I stuck him about 2 or 3 times and then I, I, then, do you want me to say into there? I sliced his throat. I didn't mean to hurt the old man but he never should have pulled a knife.

In response to Stack's *Weathersby* argument, the State asserts that it not only relied on Stack's statement, but also on the forensic evidence. Chopones sustained extensive bruising, along with approximately nineteen slicing-type wounds and thirty stab wounds -- four in the front, one in the upper abdomen, and the remainder distributed over the back from the base of the neck down both sides of the chest to the left flank with the lowest going into the left kidney. Many of these wounds were inflicted by Stack after Chopones was incapable of movement.

¶26.	Stack is incorrect in asserting that we must rely on the *Weathersby* rule even though Stack's statement is the only eyewitness testimony available. The forensic evidence available in this case presents an issue for the jury to decide as to the question of whether Stack's actions were indicative of malice. The jury was correctly instructed as to the law in this area. There was no evidence presented to justify an instruction involving heat of passion manslaughter as to the killing of Chopones. Therefore, we find this issue to be without merit.

### IV.	WHETHER THE TRIAL COURT ERRED BY DENYING THE MOTION FOR A DIRECTED VERDICT OR, IN THE ALTERNATIVE, A NEW TRIAL.

¶27.	Stack argues that the trial court should have granted his motion for a directed verdict or, alternatively, a new trial. As the basis for this motion, Stacks contends that "no reasonable jury possibly could have concluded beyond a reasonable doubt that Stack committed the murders." The standard for this Court's review is well-settled:

In appeals from an overruled motion for JNOV[,] the sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. *Esparaza v. State*, 595 So.2d 418, 426 (Miss. 1992); *Wetz*, [503 So.2d 803] at 808; *Harveston v. State*, 493 So.2d 365, 370 (Miss. 1986); *May v. State*, 460 So.2d 778, 780-81 (Miss. 1984); *Callahan v. State*, 419 So.2d 165, 174 (Miss. 1982). The credible evidence consistent with [the defendant's] guilt must be accepted as true. *Spikes v. State*, 302 So.2d 250, 251 (Miss. 1974). The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Wetz*, at 808; *Hammond v. State*, 465 So.2d 1031, 1035 (Miss. 1985); *May*, at 781. Matters regarding the weight and credibility of the evidence are to be resolved by the jury. *Neal v. State*, 451 So.2d 743, 758 (Miss. 1984); *Gathright v. State*, 380 So.2d 1276, 1278 (Miss. 1980). We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. *Wetz*, at 808; *Harveston*, at 370; *Fisher v. State*, 481 So.2d 203, 212 (Miss. 1985). *McClain*, 625 So.2d at 778.

*Shipp v. State*, 847 So.2d 806, 811-12 (¶ 20) (Miss. 2003). The State counters Stack's contention by noting that Stack's entire argument under this issue contains only thirteen lines of text and fails "to point out any particular deficiency in the proof, or to assert how the verdict is contrary to the overwhelming weight of the evidence." The State also correctly points out that we have affirmed the proposition that "there exists a presumption that the judgment of the trial court is correct and that the burden is on the appellant to demonstrate some reversible error to this Court." *Alexander v. State*, 759 So.2d 411, 418 (Miss. 2000). Thus, this issue is procedurally barred.

¶28.    Procedural bar notwithstanding, the State's evidence in this case was sufficient to support a finding of guilt as to both counts. The State presented evidence that Stack was apprehended immediately after the killings, covered in blood, and in possession of the murder weapon. Thereafter, Stack gave a statement confessing to the killings of both victims. Although the only other eyewitness to Stack's initial actions did not testify, the State produced eyewitnesses who testified that Stack was on top of Chopones stabbing him

and then turned his attack to Thomas when Thomas attempted to stop Stack. Therefore, we find this issue to be without merit.

### V. WHETHER STACK'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE STATE INDICTED STACK NINE MONTHS AFTER THE CRIME.

¶29.    Stack next contends that his Fourteenth Amendment right to due process was violated when nine months passed between the date of the crime and the indictment. In essence, Stack alleges that counsel would have been able to have a mental examination to aid in the defense. In response, the State contends that Stack is procedurally barred from raising this issue on appeal since he failed to raise it at the trial court level, relying on *Jones v. State*, 606 So.2d 1051, 1058 (Miss. 1992). In *Jones*, the defendant was prohibited from asserting a hearsay objection to the admissibility of testimony on appeal because the objection at trial was based upon failure to provide statutory notice of the proposed testimony. We held: "A trial judge will not be found in error on a matter not presented to him for decision." *Id.* at 1058 (citing *Crenshaw v. State,* 520 So.2d 131, 134 (Miss. 1988); *Ponder v. State*, 335 So.2d 885, 886 (Miss. 1976); *Howard v. State*, 507 So.2d 58, 63 (Miss. 1987)). In the case sub judice, this issue was never raised in the trial court and is, thus, barred.

¶30.    Notwithstanding this procedural bar, this issue is without merit. We have held that the failure to indict for murder for a period of twenty-one years did not violate due process:

> We have stated in a pre-indictment analysis of due process violations that the burden of persuasion is on the defendant. *Hooker v. State,* 516 So.2d 1349, 1351, (Miss. 1987), citing *United States v. Hendricks*, 661 F.2d 38, 40 (5th Cir. 1981). In order to prevail under *Hooker,* Beckwith must show that 1) the preindictment delay caused actual prejudice to him, and 2) such delay was an intentional device used by the government to obtain a tactical advantage over the accused.

*De La Beckwith v. State*, 707 So.2d 547, 569 (¶ 77) (Miss. 1997). Not only has Stack failed to show that the delay caused any actual prejudice, Stack also failed to show any tactical advantage gained by the State due to the delay. Thus, this issue is without merit.

**VI. WHETHER THE ERRORS TAKEN TOGETHER REQUIRE REVERSAL.**

¶31.    Finally, Stack contends that even if this Court were to find the aforementioned errors "near errors," that we should reverse the convictions based on the combined prejudicial impact of these errors. However, each of the foregoing assignments of error have been found to be without merit; and therefore, there is no combined prejudicial impact resulting from any perceived errors. *See McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

**CONCLUSION**

¶32.    Upon a thorough review of the record before us and consideration of the applicable law, we find no error committed by the Circuit Court of the Second Judicial District of Harrison County. Therefore, Stack's convictions for the murder of James Thomas and Larry Albert Chopones and the resulting consecutive life imprisonment sentences are affirmed.

¶33.    **COUNT I:   CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.   COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.   SENTENCES SHALL RUN CONSECUTIVELY.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB AND EASLEY, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

18

¶34.    This appeal presents a perfect example of how an accused can all too easily fall through the cracks of our judicial system.  Despite the obvious neglect of Stack's case reflected in the record, the majority erroneously finds that defense counsel's June, 2001 Motion for a Continuance was a "defense strategy" to stall the proceedings without justified reasons.  The facts clearly show that the motion for a continuance was warranted since Stack's defense counsel had been appointed to the case just four to six weeks before trial along with 124 other cases.  Smith and Dawson, Stack's counsel, had justified reasons for requesting the continuance as neither had time to prepare for trial or execute the two-year-old order calling for a mental evaluation of Stack by the State Hospital at Whitfield.  This evaluation was necessary for the preparation of Stack's defense.  For this reason, I would reverse Stack's convictions and remand this case with orders to complete the mental evaluation before proceeding with a new trial.

¶35.    As a preliminary matter, there is some dispute among this Court concerning whether attorney Smith was officially and unequivocally appointed to represent Stack on April 9, 2001.  On that day, Smith appeared before Judge Simpson to inform him that Cox, an attorney who had been appointed by the CCD to represent Stack, was no longer employed by the CCD and would no longer be handling Stack's case.  The majority suggests that on this day, the Judge appointed Smith to represent Stack.  However, that inference is not supported by the record.  There is no transcript whereby the Court can fully determine whether in fact Smith was appointed as counsel.  The only information proven as fact in the record regarding the reassignment of counsel to Stack, shows that it was not until May 2001 that both Smith and Dawson were appointed as counsel.  Since the trial began on June 14, 2001, it can only be deduced that both Smith and Dawson had four to six weeks to prepare for trial.  Furthermore, at the same time of being appointed Stack's counsel, Dawson, who had never handled a murder case before, was also assigned 124 other cases.

19

¶36.     Although the majority finds the June, 2001, motion for a continuance to be a "defense strategy," the record shows that the motion was made in good faith and based upon reasonable grounds.  At the time of the alleged murders, Stack was residing at the V.A. Hospital undergoing mental treatment.  However, these records have never been produced to the court.  After his arrest, Stack was assigned four different attorneys before proceeding to trial with the last two, Dawson and Smith.  Stack's first appointed counsel was Ellis, who did very little on his case.  Stack's second appointed counsel was Cox.  In July of 1999, Cox filed a motion for a mental evaluation.  On January 19, 2000, after a hearing, the circuit judge issued an order for mental evaluation and treatment which ordered the transfer of Stack to the State Hospital at Whitfield.  During this time, the order was never executed, and Cox continued to request medical records from the V.A. Hospital concerning Stack's mental treatment at the time of the murders.  After several delays, trial was set to begin on June 11, 2001. Cox eventually left the CCD, and Dawson and Smith were appointed Stack's case in May 2001.  Dawson and Smith immediately filed a motion for a continuance upon finding that the V.A. Hospital records had never been produced and upon learning that the two-year-old order for mental evaluation had never been executed.  Despite, their pleas, the trial judge refused to grant the motion.  Dawson and Smith then supplemented the record to reflect that Dawson and Smith had not been assigned the case until six weeks before trial, Dawson had never tried a murder case, and evidence had been presented showing that Stack had not only been a mental patient at the V.A. Hospital but also at the Timberlawn and Green Oaks facilities in Texas.

¶37.     We have addressed the issue of lack of preparation for trial and a motion for continuance in *Barnes v. State*, 249 So.2d 383 (Miss. 1971), where we stated:

> The application for continuance upon the ground that the attorney for the defendant has not had a reasonable time to prepare for trial is different from an application for continuance on the ground that there is an absent witness. . . . [A] motion for continuance upon the

20

ground that an attorney has not had sufficient time to prepare for trial is subject to proof and also as to facts as they may appear from that which is known to the trial court. . . . It is largely within the sound judicial discretion of the trial judge as to whether or not the defendant's attorney has had ample time to prepare for trial; nevertheless, where the trial court reveals a statement of facts indicating a lack of fair trial, it becomes the duty of this Court to insure such trial by granting a new trial. *Yates v. State*, 251 Miss. 376, 169 So.2d 792 (1964); 17 Am.Jr.2d Continuances 28, page 147 (1964). . . Section 26 of the Constitution of Mississippi guarantees to every person a fair and impartial trial. *Cruthirds v. State*, 190 Miss. 892, 2 So.2d 145 (1941)   A fair and impartial trial includes a reasonable opportunity to prepare for trial.  *Id.*. . . . Where the evidence is such as to leave considerable doubt as to whether or not the defendant obtained a fair trial, we will grant a new trial so that a new jury may pass upon the facts presented.  (See *Peterson v. State*, 242 So.2d 420 (Miss. 1970); *Cole v. State*, 217 Miss. 779, 65 So.2d 262 (1953); *Dickerson v. State*, 54 So.2d 925 (Miss. 1951); *Conway v. State*, 177 Miss. 461, 171 So. 16 (1936); *Taylor v. Sorsby*, 1 Miss. 97 (1921)).

249 So.2d at 384-385.  In *Barnes*, we concluded that a new trial should be granted since it was apparent from the record that the defense attorneys did not have a fair opportunity to prepare for trial  and the trial court denied his application for a continuance.  *Id.* at 383.

¶38.    In denying the motion for continuance, the circuit court found the defense attorneys had been on notice that they needed to prepare for trial.   He further found that Stack's three letters to the court demanding a speedy trial negated the need for a continuance.  In an effort to obtain the continuance, Stack waived his pro se claims for a speedy trial.

¶39.    The record clearly shows that Smith and Dawson had obtained Stack's file only six weeks before trial along with 124 other files requiring immediate attention.  Smith and Dawson had begun to prepare for this case but were unable to adequately prepare due to their many other court dates.  During and after the hearing on the requested continuance, they  reiterated to the judge that they were not prepared to proceed with trial.  They practically begged for a continuance.  The circuit court emphasized the  prior continuances in its finding, but these continuances were granted long before Smith and Dawson became involved with this action.  The circuit court's opinion emphasized that the three-year delay in prosecuting this case had

21

been "to the detriment of the system in general, certainly to the victims of the family, to the State's ability to prosecute it, to the witnesses' ability to fairly and accurately remember the circumstances, all to the detriment of both the defendant and the State in this case." It is true that the delay has affected many, but the denial of the continuance greatly prejudiced Stack and his defense. Though the majority finds this to be purely speculation, there is evidence that supports the conclusion that Stack's attorneys were unable to put on a defense due to lack of preparation.

¶40.    Dawson and Smith had not even been able to read through Stack's file. What makes this Court think that they could have adequately provided a defense? Applying our ruling in *Barnes*, it would be a manifest injustice to allow Stack's conviction to stand when his attorneys were not given a chance to put on a defense.

¶41.    In *Green v. State*, 631 So.2d 167 (Miss. 1994), we addressed the importance of a comprehensive mental evaluation to a complete defense. There, the defendant sought a psychological evaluation before trial asserting that it was needed to put on a valid defense as to his lack of malice when he assaulted the victim. *Id.* at 172. We found that since Green did not raise a mental defense before or during trial, he had no authority now to assert such a denial of right. *Id.* However, we noted that "[i]f Green had intended to use mental or emotional disturbance as a defense, a reasonable inference could be drawn that denial of a court-appointed psychologist would effect a deprivation of his rights to present evidence in his defense." *Id.*

¶42.    Here, in denying the motion for continuance, the circuit court found that Stack was "lucid" as evidenced by his pro se motion for a speedy trial. He also found that if the Stack had wanted to proceed with evidence regarding the ordered psychological evaluation, then the requisite medical records would have been timely gathered and the evaluation completed.

¶43.    Dawson and Smith were not negligent in the procurement of the medical records. Since being assigned the case, they had made every attempt to obtain the records and schedule the mental evaluation. The mental evaluation was essential to their defense, and the judge's denial of the continuance essentially denied Stack of his defense at trial.

¶44.    The majority argues that this was a "defense strategy" and that the defense failed to offer concrete proof that the outcome of the trial would have been different had more time been granted. There is ample proof in the record to support a finding that the denial of the continuance caused actual prejudice to the defense. The defense was unable to present a comprehensive defense because they had no time to prepare and were denied the benefit of the much-needed mental evaluation.

¶45.    Despite the majority's contentions, the circuit court abused its discretion in denying the motion for a continuance. For this reason, I would reverse Stack's convictions and remand this case with orders instructing the trial court to execute the order for mental evaluation before proceeding with a new trial. For this reason, I dissent.